UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
MC and RC, individually and as parents of CC, a minor
under the age of 18 years,

                                    Plaintiffs,


                    - against –


ARLINGTON CENTRAL SCHOOL DISTRICT;
ARLINGTON CENTRAL SCHOOL DISTRICT BOARD
OF EDUCATION; GEOFFREY M. HICKS, individually
and as a former Superintendent of Schools of Arlington
Central School District; FRANK V. PEPE JR., individually
and as a former Superintendent of Schools of Arlington
Central School District; DR. BRENDAN LYONS,
individually and as Executive Principal of Arlington High
School; HILARY ROBERTO, individually and as House
Principal and/or Assistant House Principal of Arlington
High School; SCOTT WOOD, individually and as a House
Principal of Arlington High School; DWIGHT BONK,
individually and as a former House Principal of Arlington
High School; CHRISTOPHER BAYER, individually and
as Committee on Special Education Chairperson for
Arlington Central School District; DENISE ZAHAKOS,
individually and as a school psychologist of Arlington
High School; DALLYSE GIRONDA, individually and as a
special education teacher at Arlington High School;
CHRISTOPHER BABB, individually and as a social worker
at Arlington High School; JEFF DEZAGO, individually and
as a guidance counselor at Arlington High School; KELLY
LAPPAN, individually and as President of Arlington Central
School District Board of Education; Unknown Teachers and
Administrators 1-100, the exact names and identities of whom
are not presently known; DUTCHESS COUNTY SHERIFF
DEPARTMENT; DEPUTY SHERIFF JANINE ARSENAULT,
individually and as Deputy Sheriff; DEPUTY SHERIFF
MICHAEL RAHILLY, individually and as Deputy Sheriff; and
Other Potential Enforcement Agencies and/or Officials of the
State of New York and/or County of Dutchess 1-100;

                                    Defendants.
------------------------------------------------------------------------------x

**OPINION AND ORDER**

No. 11-CV-1835 (CS)

<u>Appearances</u>:
Jamie S. Mattice
Giulia Frasca
Peter D. Hoffman
Law Office of Peter D. Hoffman, PC
Katonah, New York
*Counsel for Plaintiffs*

Lewis R. Silverman
Christopher J. Soverow
Rutherford & Christie, LLP
New York, New York
*Counsel for Defendants Arlington Central*
*School District, Arlington Central School*
*District Board of Education, Geoffrey M.*
*Hicks, Frank V. Pepe Jr., Dr. Brendan Lyons,*
*Hilary Roberto, Scott Wood, Dwight Bonk,*
*Christopher Bayer, Denise Zahakos, Dallyse*
*Gironda, Christopher Babb, Jeff Dezago,*
*and Kelly Lappan*

David L. Posner
McCabe & Mack LLP
Poughkeepsie, New York
*Counsel for Defendants Dutchess County*
*Sheriff's Department, Deputy Sheriff*
*Janine Arsenault, and Deputy Sheriff*
*Michael Rahilly*

<u>Seibel, J.</u>

Before the Court are the Motions to Dismiss of Defendants Arlington Central

School District ("ACSD"), Arlington Central School District Board of Education ("ACSD

BOE"), Geoffrey M. Hicks, Frank V. Pepe Jr., Dr. Brendan Lyons, Hilary Roberto, Scott Wood,

Dwight Bonk, Christopher Bayer, Denise Zahakos, Dallyse Gironda, Christopher Babb, Jeff

Dezago, and Kelly Lappan (the "Arlington Defendants"), (Doc. 29), and Defendants Dutchess

County Sheriff's Department, Deputy Sheriff Janine Arsenault, and Deputy Sheriff Michael

Rahilly (the "Dutchess Defendants"), (Doc. 25), (collectively with the Arlington Defendants,

"Defendants").  For the following reasons, Defendants' Motions are GRANTED.

## I.   **Background**

### A.   Factual Background

For the purposes of the present Motions, the Court accepts as true the facts (but not the

conclusions) as stated in Plaintiffs' Amended Complaint ("AC").

#### 1.   CC's History at Arlington High School

At all relevant times, Plaintiff CC was a student at Arlington High School ("AHS"), a

school within the Arlington Central School District.  (AC ¶ 9.)[1]  Plaintiff MC is CC's mother,

Plaintiff RC is CC's father, and at all relevant times, CC, MC, and RC resided in LaGrangeville,

New York.  (*Id.* ¶¶ 9-11.)  CC has Asperger's Syndrome and has had an Individualized

Education Program ("IEP") since at least the 2001-2002 school year (before his enrollment at

AHS).  (*Id.* ¶ 31.)  Beginning in the 2005-2006 school year (also before CC's enrollment at

AHS), the ACSD has allegedly been hostile towards Plaintiffs, as evidenced by ACSD's

"attempts to force speech therapy and the Impact Program" on CC and reporting of MC and RC

to Child Protective Services ("CPS").  (*Id.* ¶ 32.)  Due to this ongoing hostility, MC notified

ACSD on October 2, 2007 "that she did not want any one questioning Plaintiff CC without her

knowledge and written consent."  (*Id.* ¶ 33.)

Between January and March 2010, after CC had entered AHS, Defendant Gironda, a

special education teacher at AHS, encouraged CC to join the "Allies Group," which Plaintiffs

describe as "a gay and lesbian liberation group."  (*Id.* ¶¶ 22, 35.)  Defendant Zahakos, a school

---

[1] "AC" refers to Plaintiffs' Amended Complaint, filed on August 22, 2011.  (Doc. 24.)

psychologist at AHS, also suggested that CC join the group.  (*Id.* ¶¶ 21, 35.)  Despite the fact that

CC "continuously told [Gironda] no, as he is not homosexual,"[2] Gironda once asked two boys to

take CC to the club and give him a ride home.  (*Id.* ¶ 35.)[3]

2.    The Events of March 19, 2010

The bulk of Plaintiffs' claims are premised on a series of events that occurred on March

19, 2010.  On that day, at the beginning of third period, Gironda noticed that CC "'looked sad.'"

(AC ¶ 37.)  During fourth period, Gironda told CC that he had to eat lunch with her in the Impact

Program room.  (*Id.* ¶ 38.)  Plaintiffs allege that CC was sad because of the "combination of

having lunch with . . . Gironda and eating in the Impact Program room."[4]  (*Id.*)  CC was brought

to the Impact Program room so that a social worker, Freya Bomba, could evaluate him.  (*Id.* ¶

40.)  Bomba then sent CC to his fifth period class.  (*Id.*)  Approximately 10 minutes into class,

CC was called to the guidance office.  (*Id.* ¶ 41.)  The office was "closed off," and a woman sent

CC back to class.  (*Id.*)  He went to the bathroom before returning to class, and upon exiting the

bathroom, Defendant Dezago, a guidance counselor at AHS, was waiting for CC and took him to

the West Assistant Principal's Office at approximately 11:15 a.m.  (*Id.* ¶¶ 24, 41-42.)  From

there, Dezago and Zahakos took CC to the guidance office and questioned him.  (*Id.* ¶¶ 41-42.)

Defendant Roberto, the Assistant Principal and/or a House Principal, was present for at least

fifteen minutes of questioning.  (*Id.* ¶¶ 17, 42.)  One of the questions they asked CC was, "'What

---

[2] The name of the group suggests it was not only for gay and lesbian students but also for their "allies."

[3] Although I disregard the assertion for purposes of the instant Motions, Gironda maintains that she "encouraged
C.C. to participate in the Allies Club to further his social life."  (*See* Memorandum of Law in Support of [the
Arlington] Defendants' Motion to Dismiss ("ADs' Mem."), (Doc. 33), 7.)

[4] Plaintiffs state that CC "acknowledges being sad around Gironda because she made him so uncomfortable with her
insistence that he join The Allies Group."  (AC ¶ 37.)

if both of your parents were killed tomorrow, would you be suicidal then?'"[5]  (*Id.* ¶ 42.)  CC responded by saying that he would be "very sad, but not suicidal."  (*Id.*)

At 11:49 a.m., Dezago called MC and informed her that he and four administrators believed that CC was suicidal.  (*Id.* ¶ 47.)  Dezago asked MC to come in to discuss next steps, and she replied that "she would be there as soon as she had transportation."  (*Id.*)  He responded that he would call her back in a few minutes after speaking to an administrator because he was not sure of the procedure for handling the situation.  (*Id.*)  At approximately 12:10 p.m., an "unidentified man dressed in white" entered the room where CC was being questioned and informed CC that he heard he was suicidal.  (*Id.* ¶ 43.)  About ten minutes later, Arsenault, the Deputy Sheriff, entered the room.  (*Id.* ¶ 44.)[6]  Arsenault and Zahakos told CC that "he could either go to the hospital or be arrested," and CC chose the hospital option.  (*Id.* ¶ 46.)

Also at 12:10 p.m., Dezago called MC back and informed her that two other administrators – in total, Defendants Dezago, Zahakos, Gironda, Babb (a social worker at AHS), Wood (a House Principal at AHS), and Roberto – believed that CC was suicidal and needed to go to the hospital.  (*Id.* ¶¶ 18, 23, 48.)  Dezago told MC that Defendant Bonk, the House Principal, also agreed they should call an ambulance.  (*Id.* ¶ 48.)  MC "pleaded with Dezago for them to not call the ambulance and let her come in to pick up CC," but Dezago responded that an

---

[5] Although I disregard their assertion for purposes of the instant Motions, the Arlington Defendants maintain that this question was posed because CC had made several suicide-related comments earlier, including the following: "'I have no motivation,'" "'I have no reason to live,'" and "'Nobody takes me seriously,'" and because CC told Zahakos and Dezago that day that he "had thought about killing himself," if "'I don't have a good life, have a good job, have friends, or my parents died.'"  (ADs' Mem. 8.)

[6] Although I disregard their assertion for purposes of the instant Motions, the Arlington Defendants maintain that the police were already at AHS because they had been called in response to an unrelated assault involving a different student.  (ADs' Mem. 10.)

ambulance was already on its way.[7]  (*Id.*)  Plaintiffs recount the remainder of the conversation as follows:

> MC asked Defendant Dezago who was going to pay for [the ambulance].  MC informed Defendants that she would be recording the conversation.  Defendant Wood threatened MC that she had the option of having CPS come to her house with CC or the ambulance could take CC to the hospital.  MC elected for CPS to bring CC home, but then Defendant Zahakos yelled out that was not an option.  To this, Defendant Wood stated that MC would have to take CC for an evaluation and she agreed.  Defendant Wood yelled back that it was too late for MC to pick up CC because the ambulance was already called.  Plaintiff MC continued to plead with Defendant ACSD to allow her to pick up Plaintiff CC . . . . Defendant Arsenault then informed MC that if she tried to interfere in any way, she would be arrested.

(*Id.* ¶¶ 49-50.)  Eventually, the fire department took CC to the hospital in an ambulance; their report noted that he was "calm."  (*Id.* ¶ 51.)[8]

At the hospital, Dezago and MC had an exchange during which Dezago told MC that "he was one of only a few people that actually liked CC and MC, in fact there were many people that hated MC and CC," and that "CC belonged at the hospital and so did MC."  (*Id.* ¶ 56.)  While at the hospital, CC informed MC that he "never felt worse in all his life" than he did after Defendants' questioning that morning; "[t]hey kept speaking to him about suicide, but all he wanted to do was to return to class."  (*Id.* ¶ 58.)  CC also told MC that while he was being questioned, "Arsenault kept reaching for her gun," and that "the entire time he was with them, he

---

[7] Although I disregard their assertion for purposes of the instant Motions, the Arlington Defendants allege that the ambulance was called in response to an unrelated assault in the school that had injured a teacher.  (ADs' Mem. 10.)  Plaintiffs, on the other hand, allege that the fire department was not called to transport CC by ambulance to the hospital until 12:18 p.m., while Defendants were on the phone with MC.  (AC ¶ 52.)

[8] The same report, which I may consider because the AC refers to it, (*see* AC ¶ 51), says CC was "upset about [his] parents being mad [at] him," (Declaration [of Jamie Mattice] in Support of Plaintiffs' Opposition to Defendants['] Motions to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and 8(a) ("Mattice Decl."), (Doc. 37), Ex. D).  As discussed below, however, I ultimately have decided not to consider this document or the other documents submitted with the parties' motion papers, as these documents would have no effect on my decision in this case.

was afraid one of them was going to kill him."  (*Id.*)  CC was dismissed from the hospital as "negative for suicide."  (*Id.* ¶ 54.)

        3.     <u>Requests for Records</u>

Shortly after the March 19th incident, Plaintiffs requested records from Defendants relating to the incident.  Specifically, they requested ACSD's suicide and transport policies but never received them.  (*Id.* ¶ 61.)  MC wrote to Defendant Hicks, the former Superintendent, to let him know that Defendants Pepe (the Superintendent), Lyons (Executive Principal of AHS), and the ACSD BOE did not investigate the incident or provide her with the school records regarding the March 19th incident, but Hicks never responded.  (*Id.* ¶¶ 14-16, 62.)  On May 7, 2010, MC reviewed CC's education, special education, and medical records, but found no information about the March 19th incident.  (*Id.* ¶ 63.)  When she requested information about the incident, Lyons provided her with the names of the three officers involved and stated that he did not have to give her the records because she was not an attorney.  (*Id.*)  On May 17, 2010, MC obtained two incident reports from the Dutchess County Sheriff's Office ("DCSO"), and on May 19, 2010, she received the case report from Arsenault.  (*Id.* ¶¶ 67, 69.)  One incident report noted that Roberto placed a 911 call at 10:53 a.m. and told the operator that she was calling regarding an emotionally-disturbed person and attempting to restrain CC, although Plaintiffs believe CC was still in his fifth-period class at that time.  (*Id.* ¶ 67.)  Plaintiffs attempted to obtain copies of the 911 records, tapes, and/or transcripts but were not successful.  (*Id.* ¶ 71.)  In an attempt to obtain CC's school records and the 911 records, Plaintiffs commenced an (apparently unsuccessful) action in New York State Court.  (*Id.* ¶ 72.)

4.      Contact with SC

At some point during the last several years, CC was friends with another student named SC.  Plaintiffs allege that Gironda knew about this friendship and knew that it had recently changed.  (*Id.* ¶ 74.)  On June 11, 2010, CC asked Gironda if she knew where SC was, and Gironda replied, "[W]hat are you a stalker or something?"  (*Id.* ¶ 75.)  On June 16, 2010, Roberto called RC and informed him that SC's parents had complained about an incident involving CC patting SC on the back on June 11, 2010.  (*Id.* ¶ 76.)  On July 11, 2010, SC's parents came to Plaintiffs' home, pounded on the door and stated that CC had called SC that morning and that he was a stalker and was harassing SC.  (*Id.* ¶ 77.)  Plaintiffs believe SC's parents obtained their address from Gironda or Roberto.  (*Id.* ¶ 80.)

B.      Procedural History

Plaintiffs filed their Complaint in this action on March 16, 2011.  (Doc. 1.)  At a conference before this Court on July 22, 2011, I required Plaintiffs to amend the Complaint to remove material that was either irrelevant or not actionable, and address, to the extent possible, the issues raised by Defendants in their pre-motion letters.  (*See* Minute Entry July 22, 2011.)  On August 22, 2011, Plaintiffs filed their AC.  (Doc. 24.)  On September 22, 2011, Defendants moved to dismiss the AC.  (Docs. 25, 29.)

## II.   **Documents the Court May Consider**

The parties submitted a plethora of documents as attachments to their Motions and opposition to the Motions.  "When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint" – including materials attached or integral to the complaint, documents incorporated into the complaint by reference, or matters of which the

8

court may take judicial notice – "or convert the motion to one for summary judgment" under

Federal Rule of Civil Procedure 56. *Robinson v. Pierce*, No. 11-CV-5516, 2012 WL 833221, at

*3 (S.D.N.Y. Mar. 13, 2012). I have reviewed the materials submitted by the parties and have

determined that they would have no effect on the outcome of my decision on the pending

Motions.[9] Accordingly, I need not decide which documents would have been eligible for

consideration. *See Staub v. Henshaw*, No. 06-CV-98, 2006 WL 1650687, at *2 (W.D.N.Y. June

7, 2006) ("court need not consider any evidence outside the pleadings, and need not convert the

motion to dismiss into a motion for summary judgment, because plaintiff has failed to plead facts

sufficient to state a claim").

## III.   Discussion

### A.   Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

---

[9] I have disregarded the documents, but had I considered them, many – including those submitted by Plaintiffs – would have supported the position of Defendants. Furthermore, the affidavit of MC submitted by Plaintiff, (*see* Mattice Decl. Ex. 1), should not be considered at the motion to dismiss stage. *See Sandy Hollow Assocs. LLC v. Inc. Vill. of Port Washington N.*, No. 09-CV-2629, 2010 WL 6419570, at *8 (E.D.N.Y. Sept. 6, 2010) (declining to consider declaration for purposes of motion for judgment on the pleadings); *Toussie v. Town Bd. of the Town of E. Hampton*, No. 08-CV-1922, 2010 WL 597469, at *5 (E.D.N.Y. Feb. 17, 2010) (declining to consider affidavits on motion to dismiss and noting parenthetically that "the consideration of an affidavit in ruling on a motion to dismiss [is] improper"); *cf. Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co.*, 475 F. Supp. 2d 400, 405 (S.D.N.Y. 2007) ("It is . . . error to consider affidavits and exhibits submitted by defendants . . . in ruling on a 12(b)(6) motion to dismiss.") (internal quotation marks omitted).

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'"  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

    B.    <u>Federal Claims</u>

        a.    <u>Section 1983</u>

Plaintiffs assert federal claims pursuant to 42 U.S.C. § 1983 ("Section 1983").  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To successfully assert a Section 1983 claim, a plaintiff must demonstrate: "(1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under color of state law, or a state actor."  *Walker v. Clemson*, No. 11-CV-9623, 2012 WL 2335865, at *3 (S.D.N.Y. June 20, 2012) (internal quotation marks omitted).

     i.     <u>Substantive Due Process</u>

Plaintiffs assert substantive due process claims against the Arlington Defendants and Defendant Arsenault for "failing to provide CC protection of his right to be free from harassment and discrimination" and "taking a student who was not, and had never been, suicidal and sending him to the hospital, where a psychiatric record was created."  (AC ¶¶ 84-85.)  Plaintiffs also allege that the Arlington Defendants failed to "effectively train and supervise employees and students" "in order to prevent students . . . from becoming subject to . . . ongoing discrimination, harassment and intimidation."  (*Id.* ¶¶ 89, 92.)

"To state a substantive due process claim, a plaintiff must allege that (1) the complained-of-state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary."  *JG & PG ex rel. JGIII v. Card*, No. 08-CV-5668, 2009 WL 2986640, at *5 (S.D.N.Y. Sept. 17, 2009).  As to the first element, "[t]he Supreme Court has recognized . . . th[at] '[l]iberty from bodily restraint . . . [is at] the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'"  *M.H. v. Bristol Bd. of Educ.*, 169 F. Supp. 2d 21, 30 (D. Conn. 2001) (third and fourth alterations in original) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982)).  As to the second element, conduct that is deemed to be "arbitrary or oppressive" must "shock the conscience."  *West v. Whitehead*, No. 04-CV-9283, 2008 WL 4201130, at *13 (S.D.N.Y. Sept.

11, 2008).  "While the measure of what is conscience shocking is no calibrated yard stick," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998), "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," *id.* at 849.  Making a bad decision or acting negligently is not the sort of "conscience shocking" behavior that violates the Constitution.  *See id.*; *compare Rochin v. California*, 342 U.S. 165, 172-73 (1952) (breaking into suspect's room and forced pumping of his stomach to obtain evidence shocked conscience); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 249-52 (2d Cir. 2001) (gym teacher violently assaulting eighth grade student shocked the conscience because behavior was "malicious[] and sadistic[]" and served no legitimate purpose, and was of kind "likely to cause substantial physical injury or emotional suffering and a need for medical treatment"); *JG*, 2009 WL 2986640, at *2 (denying dismissal where defendants allegedly "locked Plaintiff-Children in closets or bathrooms for extended periods of time"; "used physical force to restrain and sometimes force feed Plaintiff-Children, causing vomiting and injury"; "engaged in inappropriate sexual conduct in front of Plaintiff-Children"; "photographed Plaintiff-Children's private parts"; "taunted Plaintiff-Children and called them degrading names"; and "refused to change certain Plaintiff-Children's diapers"), *with Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 276 (2d Cir. 2011) (requiring student to be evaluated psychiatrically not conscience-shocking); *Smith v. Guilford Bd. of Educ.*, 226 F. App'x 58, 62 (2d Cir. 2007) (summary order) ("failure to respond to the harassing and bullying" of student does not shock conscience); *Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) ("[s]triking a student without any pedagogical or disciplinary justification," while "undeniably wrong," does not "shock the conscience"); *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 770-71 (S.D.N.Y. 2011) (school administrator's

underestimate of severity of verbal harassment of plaintiff-student and accompanying imposition of minimal punishment on harassers who later violently attacked plaintiff-student did not shock conscience); *Faccio v. Eggleston*, Nos. 10-CV-783, 10-CV-699, 2011 WL 3666588, at *12 (N.D.N.Y. Aug. 22, 2011) ("[V]erbal abuse alone is not normally a constitutional violation – even in the context of teachers belitting students."); *Myslow v. New Milford Sch. Dist.*, No. 03-CV-496, 2006 WL 473735, at *14 (D. Conn. Feb. 28, 2006) (encouraging parents to medicate student "simply does not rise to the level that can be described as conscience-shocking"); *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421, 434 (N.D.N.Y. 2005) (school's overbroad interpretation of behavior code does not shock conscience); *Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284, 296-97 (E.D.N.Y. 2004) (teacher's racial slurs did not shock conscience); *Bisignano v. Harrison Cent. Sch. Dist.*, 113 F. Supp. 2d 591, 596, 599-600 (S.D.N.Y. 2000) (teacher confining student to storage closet did not shock conscience).

On the facts alleged, I cannot say that Defendants' decision to evaluate and question CC regarding his purported suicidal tendencies and then send him to the hospital "transgressed the 'outer limit' of legitimate governmental action,"[10] *Cohn*, 363 F. Supp. 2d at 434 (quoting *Natale*

---

[10] Notably, Plaintiffs do not contend that Defendants fabricated their story that CC was suicidal or that Defendants did not sincerely believe that CC exhibited suicidal tendencies.  Rather, Plaintiffs simply allege that CC was not actually suicidal on the day he was taken to the hospital.  (*See, e.g.*, AC ¶ 48 (Dezago called MC and informed her that there were six administrators who believed CC was suicidal and needed to go to the hospital); Plaintiffs' Memorandum of Law in Opposition to Defendants['] Motions to Dismiss ("Ps' Mem."), (Doc. 36), 11 (Defendants "wrongly determined that [CC] was suicidal").)  Accordingly, this case is factually distinguishable from *Camac v. Long Beach City School District*, No. 09-CV-5309, 2011 WL 3030345, at *4, 14 (E.D.N.Y. July 22, 2011), where the court sustained a substantive due process claim after plaintiffs alleged that defendants made a false report to the police of a student's suicide attempt and falsely testified under oath to the same, which resulted in the child's fourteen-day commitment to a hospital against the parents' wishes.  *See Cox*, 654 F.3d at 276 (report to child and family services, even if alleged to be "exaggerated and misleading," was not materially false; therefore, absent evidence that defendant acted with malice, substantive due process claim could not withstand summary judgment motion).  Assuming, as I must, that Defendants were incorrect in their assessment, that could plausibly constitute negligence – although it is far from clear that it would – but negligent conduct does not meet the standard for a

*v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)), such that it can be said to "shock the conscience."   The parties have not cited, and the Court has not found, any cases holding that conduct similar to the complained-of action in this case rises to such a level.  While CC was ultimately taken to the hospital against his will, the school personnel involved are not alleged to have physically touched or restrained CC – besides telling him to come into a room for questioning – or otherwise physically harmed him.  Nor are they alleged to have been hostile towards him or yelled at him.  They did no more than evaluate and talk to CC about his purported suicidal tendencies and then call other professionals who helped make the decision to send CC to the hospital.  Even if the questioning, presence of an armed police officer, threat of an arrest, ambulance, and hospitalization were unnecessary, intimidating, upsetting, or even harmful, they do not rise to the required level of oppressive or arbitrary action.  *See Cox*, 654 F.3d at 275 (substantive due process claim requires more than "incorrect or ill-advised" act; rather, conduct must be "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection") (internal quotation marks omitted); *cf. id.* at 274 (noting in context of First Amendment retaliation claim that "[i]n their various roles, school administrators must distinguish empty boasts from serious threats, rough-housing from bullying, and an active imagination from a dangerous impulse. Making such distinctions often requires an investigation . . . . This is so even when a student is separated, interviewed, or temporarily sequestered to defuse a potentially volatile or dangerous situation."); *id.* ("[A] school administrator must be able to react to ambiguous student speech by temporarily removing the student from potential danger (to himself and others) until it can be

---

substantive due process violation.  *See Sacramento*, 523 U.S. at 849 ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process").

determined whether the speech represents a real threat to school safety and student learning.

Such acts deserve unusual deference from the judiciary.") (internal quotation marks omitted).

Nor do I find that the allegations regarding the Arlington Defendants' purported failure to

train and supervise its employees to prevent discrimination and harassment plausibly implicate

conscience-shocking behavior.  Even if certain school employees could be said to have acted

negligently – which I do not find, in part because Plaintiffs do not even specify which actors

were improperly supervised or what purported missteps they took – Plaintiffs' claim fails

because these allegedly negligent employees did not actually violate CC's constitutional rights,

*see Faccio*, 2011 WL 3666588, at *16 ("Because the middle school staff did not violate

plaintiffs' constitutional rights, any claims against the District for failure to supervise the middle

school staff will also be dismissed."), and because there are simply no allegations that any

Defendant was aware of a risk of harm to CC and acted with deliberate indifference to that risk

such that his or her behavior could be said to shock the conscience, *see Lynn ex rel. Julie B. v. St.

Anne Inst.*, No. 03-CV-1333, 2006 WL 516796, at *10 (N.D.N.Y. Mar. 2, 2006) (dismissing

substantive due process claims because there was "insufficient evidence that the need for more or

additional training, or additional supervision, was 'obvious,'" and therefore, any "failure to train,

or failure to supervise cannot be said to be closely related to Plaintiff's injuries") (quoting *City of

Canton, Ohio v. Harris*, 489 U.S. 378, 390 & n.10 (1989)).  Nor does any of the other conduct

alleged by Plaintiffs – *e.g.*, Gironda's suggestions that CC join the Allies Group and her taking

him to the Impact Program room for lunch, Dezago's calls to MC regarding CC's transportation

to the hospital,[11] or Defendants' purported failure to provide Plaintiffs with records of the

incident – come close to plausibly alleging a constitutional violation.[12]

      Because none of the Defendants' conduct, singly or in combination – even if ill-advised

or unwarranted – rises to the level of "outrageous and egregious under the circumstances" or

"truly brutal and offensive to human dignity," *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir.

2007) (internal quotation marks omitted), Defendants' Motions to Dismiss Plaintiffs' substantive

due process claims are granted.

### ii.   Equal Protection

      Plaintiffs next allege that the Arlington Defendants created a hostile educational

environment for CC by failing to address ongoing discrimination, harassment, and intimidation

directed at CC.  (AC ¶ 95.)  Plaintiffs do not specify a theory under which they seek relief;

indeed, their Memorandum of Law addresses this claim in less than one page and does not cite to

a single legal authority in support of it except for a letter from the U.S. Department of

Education's Office for Civil Rights generally describing harassment in the student-bullying

context.[13]  (*See* Ps' Mem. 16.)  Because Plaintiffs have not identified any action by Defendants

---

[11] To the extent Plaintiffs allege that MC experienced a temporary loss of custody by not being able to pick CC up from school, (*see* AC ¶ 49; Ps' Mem. 12), this argument is meritless, because "[a]bsent truly extraordinary circumstances, a brief deprivation of custody" does not rise to the level of a substantive due process violation.  *Cox*, 654 F.3d at 275.

[12] If Plaintiffs are alleging that Gironda and Zahakos suggesting that CC join the Allies Group constituted a substantive due process violation, such an allegation would be frivolous.  There is no respect in which CC's liberty was infringed by the suggestions, which were not followed, and there is nothing that shocks the conscience about the suggestions, especially in the absence of any allegation that they were based on anything other than sincerely held views as to what would be in CC's best interests.

[13] In fact, the language in the AC describing the equal protection claim sounds in substantive due process.  (*See* AC ¶ 98 (referring to "conscience shocking discrimination").)  To the extent Plaintiffs seek relief for harassment or discrimination under a substantive due process theory, their claim fails for the reasons discussed above:  the AC is simply devoid of any allegations of conduct that rises to the level of shocking the conscience.

that distinguished between disabled and non-disabled students, let alone for an irrational reason, an equal protection claim may only be brought here, if at all, as a "class of one" claim. *See Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2009 WL 3151200, at *6 (S.D.N.Y. Sept. 29, 2009).

"The Supreme Court has recognized 'class of one' claims 'where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Pape*, 2009 WL 3151200, at *6 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). To prevail on a class-of-one claim, the Plaintiff must demonstrate a "level of similarity between the plaintiff and the person(s) with whom []he compares h[im]self," which is "extremely high – so high . . . that" (1) "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," and (2) "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.*

Plaintiffs have failed to allege facts from which I may infer a violation of CC's rights under the Equal Protection Clause. The AC is devoid of any facts indicating that CC was treated differently than other similarly situated individuals. *See id.* at *5-7 (dismissing equal protection claim where plaintiff alleged that school district wrongfully graduated her from program for disabled children and stopped funding special education program in which she was enrolled based on "discriminatory animus" against plaintiff due to disability, but plaintiff failed to identify any similarly situated individuals) (collecting cases); *see also Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) (complaint properly dismissed where it either cited no other instances of defendant's conduct in similar situation or failed to set out facts

17

showing required extremely high degree of similarity). Indeed, Plaintiffs have not identified in their AC any "similarly situated" individual, much less one who was treated differently than CC. Plaintiffs' Memorandum of Law in opposition to the instant Motion is also unavailing, as the only assertions regarding their equal protection claim are that Defendants had a "long history of retaliation and deliberate indifference," "interfere[d] with . . . CC's ability to participate in school activities [by] . . . harass[ing] him with questions pertaining to his parents' death and . . . forc[ing] him to go to the hospital," and failed to properly investigate the events of March 19, 2010 after the fact. (Ps' Mem. 16.) These are nothing more than a rehash of other claims; any connection to a purported equal protection violation is vague and conclusory. *See Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555.[14] Accordingly, the Arlington Defendants' Motion to Dismiss Plaintiffs' equal protection claim is granted.

b.  <u>Americans with Disabilities Act and Rehabilitation Act</u>

i.  <u>Exhaustion</u>

As a threshold matter, the Arlington Defendants suggest that Plaintiffs' failure to exhaust administrative remedies afforded under the Individuals with Disabilities Education Act ("IDEA")[15] is fatal to their Americans with Disabilities Act ("ADA") and Rehabilitation Act Section 504 ("Section 504") claims.[16] (ADs' Mem. 23-24.)

---

[14] Even if Plaintiffs had established that CC was singled out because of his membership in a protected class or irrationally, his equal protection claim for a hostile educational environment would fail because the sum total of the alleged harassment directed to CC and affecting his school environment – the March 19, 2010 incident, the suggestion of the Allies Group, and Gironda's alleged June 11, 2010 comment – is not sufficiently "severe or pervasive" to constitute a hostile educational environment. *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (internal quotation marks omitted).

[15] The IDEA mandates that states provide disabled children with a "free appropriate public education." 20 U.S.C. § 1400(d)(1)(A); *see Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 150 (2d Cir. 1992). Its "primary purpose is to ensure that all children with disabilities receive a free appropriate public education, which emphasizes special education and related services designed to meet their unique needs and to assure that the rights of children with

18

Where, as here, Plaintiffs' AC does not allege a violation of the IDEA, the IDEA's exhaustion requirement will still operate if the relief Plaintiffs seek "would also be available under the IDEA." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 n.2 (2d Cir. 2008) ("IDEA's exhaustion requirement applies equally to relief available under other statutes, such as the ADA, Section 504, and § 1983, if the relief sought under those statutes would also be available under the IDEA."). For instance, in *Hope v. Cortines*, 69 F.3d 687 (2d Cir. 1995), the Second Circuit affirmed the district court's dismissal – for failing to exhaust administrative remedies – of a dyslexic student's ADA claim seeking injunctive relief against a school for its refusal to provide appropriate educational services, as the requested relief was effectively an indirect challenge to the adequacy of the student's IEP[17] – a case the district court characterized

---

disabilities and their parents or guardians are protected." *Murphy v. Town of Wallingford*, No. 10-CV-278, 2011 WL 1106234, at *2 (D. Conn. Mar. 23, 2011) (internal quotation marks omitted). "The IDEA statutory framework includes extensive administrative procedures that a plaintiff must exhaust before pursuing a claim based on the IDEA in state or federal court." *Id.* at *3; *see J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 112 (2d Cir. 2004) ("It is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court . . . .").

[16] While there is some dispute in this Circuit as to whether the IDEA's exhaustion requirement is jurisdictional – such that it is properly addressed on a Rule 12(b)(1) motion as opposed to a Rule 12(b)(6) motion, *see Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 503 n.13 (S.D.N.Y. 2011) (collecting cases) – the distinction is irrelevant in this case because I find that Plaintiffs need not exhaust administrative remedies under either standard.

[17] As one district court recently explained:

> An IEP is a written statement setting forth: (1) the child's present levels of academic achievement and functional performance; (2) measurable annual goals, both academic and functional; (3) how the child's progress . . . will be measured; (4) the special education and related services and supplementary aids and services to be provided the child; (5) an explanation of the extent, if any, to which the child will not participate in regular school classes and activities; (6) how the child will participate in required testing; (7) a projected date for the beginning of the child's support services and details about their frequency, location, and duration; and (8) a statement regarding the child's goals for and transition to life post-secondary education.

*Baldessarre*, 820 F. Supp. 2d at 496 n.4 (alteration in original) (internal quotation marks omitted); *accord Piazza v. Fla. Union Free Sch. Dist.*, 777 F. Supp. 2d 669, 673 (S.D.N.Y. 2011).

as "a textbook example of the types of cases justifying administrative exhaustion," *Hope v. Cortines*, 872 F. Supp. 14, 21 (E.D.N.Y. 1995).

In this Circuit, "'relief that is also available' under the IDEA has been broadly construed 'to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers.'" *Baldessarre*, 820 F. Supp. 2d at 502-03 (quoting *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483, 488 (2d Cir. 2002)); *see Polera*, 288 F.3d at 487-91 (court lacked subject matter jurisdiction over plaintiff's ADA and Rehabilitation Act claims due to failure to exhaust administrative remedies notwithstanding student's request for monetary damages – not available under the IDEA – in addition to injunctive relief). Even where a plaintiff is not explicitly requesting a change to his or her IEP, but instead appears to be requesting alternative relief, this Circuit has held that the IDEA's exhaustion requirement may still apply. *See, e.g.*, *Cave*, 514 F.3d at 247. In *Cave*, a hearing-impaired student brought suit – alleging discrimination in violation of the ADA, Rehabilitation Act, and Section 1983 – after he was denied entry into school facilities with a service dog. *See id.* at 243-44. Although the plaintiff in *Cave* "explicitly renounced any challenge to the educational adequacy of [the student's] IEP," providing the relief sought – permission to bring a service dog to school – would require the school to make changes to the student's IEP. *Id.* at 247 ("[student's] class schedule under his existing IEP would have to be changed to accommodate the concerns of allergic students and teachers and to diminish the distractions that [the dog's] presence would engender"; school would "have to make certain practical arrangements to maintain the smooth functioning of the school and to ensure both that [the dog] was receiving proper care and that [the student] continued to receive necessary and

appropriate educational and support services").  In other words, awarding the relief would "implicate [the student's] IEP and would be best dealt with through the administrative process." *Id.* at 247-48, 250 (dismissing claims for failure to exhaust administrative remedies).  Where, however, "the administrative procedures do not provide an adequate remedy," a plaintiff is not required to exhaust his or her administrative remedies.  *See J.S.*, 386 F.3d at 112.

While some of the language in the AC concerning Plaintiffs' ADA claim appears to take issue with CC's IEP, (*see* AC ¶ 106 ("Defendants completely disregarded or ignored CC's disability"); *id.* ¶ 107 (Defendants have denied CC "participation in and benefits of a free and appropriate education"); *id.* ¶ 108 ("The actions of Defendants . . . constitute gross mismanagement of . . . CC's educational program, which has denied CC equal services, programs or activities based on his disability")), there are no facts supporting such claims, and Plaintiffs do not appear to be requesting any form of relief that would be available under the IDEA.  Their claims focus solely on past discriminatory and retaliatory actions, rather than ongoing defects in CC's educational program, and they seek only damages to redress this past harm, not relief that could be effectuated through a change to CC's IEP.  *See Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 333-34 (S.D.N.Y. 2005) ("[D]enial of *access* to an appropriate educational program on the basis of a disability is a Section 504 issue, whereas dissatisfaction with the *content* of an IEP would fall within the purview of IDEA.") (emphasis in original); *cf. Baldessarre*, 820 F. Supp. 2d at 509 ("[B]ecause Plaintiffs have not alleged any discrimination on the part of the State, there is no reason to think that the state administrative process would not have been able to remedy the situation.").

In sum, because the crux of the conduct about which Plaintiffs complain in the AC could not be rectified through the administrative process, *see Taylor v. Vt. Dep't of Educ.*, 313 F.3d

768, 789 (2d Cir. 2002) (noting parenthetically that "administrative remedies can provide only prospective educational benefits"), it would have been futile for Plaintiffs to exhaust their administrative remedies prior to filing suit, and they are excused from the exhaustion requirement, *see Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007) ("exhaustion requirement does not apply in situations in which exhaustion would be futile") (internal quotation marks omitted); *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 600 (S.D.N.Y. 2011) ("[W]here a plaintiff seeks relief that is not available under the IDEA, such as compensatory damages for injuries, exhaustion is excused."); *see also Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 913, 917 (6th Cir. 2000) (exhaustion futile where allegations did not concern sufficiency of education provided to disabled student but instead arose from discipline imposed on student wherein school officials locked student in a small, dark, unventilated room for long periods of time).

ii.      Substantive Claims under the ADA and Section 504

Plaintiffs assert claims under Section 504 of the Rehabilitation Act and Title II of the ADA against the Arlington Defendants.[18]  Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely* by reason of her or his disability, be excluded from

---

[18]Plaintiffs specifically assert these claims against "all ACSD and ACSD BOE Defendants."  (AC 22, 24.)  To the extent Plaintiffs attempt to bring their claims against the individually-named Defendants in their individual capacities, they may not do so, as neither the ADA nor Section 504 provides for individual liability.  *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.").  Plaintiffs' experienced counsel ought to have been aware of this black-letter law.  To the extent that the claims are asserted against the individually-named defendants in their official capacities, the claims would likely fail as duplicative of the claims against the ACSD and the ACSD BOE.  *See A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ.*, No. 08-CV-1962, 2012 WL 120052, at *12 (E.D.N.Y. Jan. 17, 2012).  In any event, I need not decide whether the claims are duplicative because Plaintiff has failed to state a claim on which relief may be granted.

the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a) (emphasis

added).  Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.  As the statutory language makes clear, "[a]part from the

Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach

of only federally funded – as opposed to 'public' – entities, the reach and requirements of both

statutes are precisely the same."  *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir.

2002).  While claims are often analyzed under the two statutes together, *see, e.g.*, *Rodriguez v.

City of N.Y.*, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 . . . and the ADA impose

identical requirements, we consider these claims in tandem."); *Scruggs v. Meriden Bd. of Educ.*,

No. 03-CV-2224, 2007 WL 2318851, at *16 (D. Conn. Aug. 10, 2007) (same), Plaintiffs assert

different claims under each statute, and therefore I examine them separately.

### a.      Discrimination – ADA

A party asserting a claim under Section 504 or the ADA must show:  "(1) that he or she is

a qualified individual with a disability; (2) that the defendants are subject to the relevant statute;

and (3) that he or she was denied the opportunity to participate in or benefit from the defendants'

services, programs or activities, or was otherwise discriminated against by defendants, by reason

of his or her disability."  *Dzugas-Smith v. Southold Union Free Sch. Dist.*, No. 08-CV-1319,

2012 WL 1655540, at *16 (E.D.N.Y. May 9, 2012).  As to the last prong, "[i]n the special

education context, . . . a plaintiff must show that defendants acted with bad faith or gross

misjudgment."  *See R.B. ex rel. L.B. v. Bd. of Educ. of N.Y.*, 99 F. Supp. 2d 411, 419 (S.D.N.Y.

2000).  Plaintiffs need not, however, "show defendants acted with animosity or ill will."  *Id.*

"Rather, intentional discrimination may be inferred when a school district acts with gross

negligence or reckless indifference in depriving a child of access to a [free and appropriate

public education]."  *See Gabel*, 368 F. Supp. 2d at 334.

Plaintiffs allege that the Arlington Defendants violated their rights under the ADA by

discriminating against CC on the basis of his disability and denying him equal services,

programs, or activities.  (AC ¶¶ 107-08.)  Specifically, Plaintiffs allege that (1) Defendants

disregarded CC's disability and his difficulties with social interaction when they "relentlessly

questioned him about the potential death of his parents, . . . involved Defendant Arsenault, who

eventually threatened him with arrest if he did not go to the hospital[,]" (Ps' Mem. 17; *see* AC ¶¶

106-07), and unlawfully removed him from school on March 19, 2010, (AC ¶ 107); and (2)

Gironda "repeatedly attempted to force the Allies Group" on CC and "gave no consideration to .

. . CC's difficulties with social interaction when he went to her for assistance concerning his

friendship with . . . S.C.," (P's Mem. 17-18; *see* AC ¶ 106).

Plaintiffs have not alleged sufficient facts to withstand the Arlington Defendants' Motion

to Dismiss.  Plaintiffs have not specified any programs, activities, or benefits from which CC

was excluded.  Removal from school for less than a half-day does not amount to deprivation of

access to school programs.  *See, e.g.*, *Tylicki v. St. Onge*, 297 F. App'x 65, 67 (2d Cir. 2008)

(summary order) (suspension from school does not constitute denial of access to programs under

ADA or Rehabilitation Act); *cf. Cox*, 654 F.3d at 273-74 (discussing, in First Amendment

context, need for school administrators to have leeway to "separate[], interview[], or temporarily

sequester[]" students and to "react to ambiguous student speech by temporarily removing the

student from potential danger (to himself and others) until it can be determined whether the

speech represents a real threat to school safety and student learning," and finding that "[s]uch

acts deserve unusual deference from the judiciary") (internal quotation marks omitted). Nor

have they alleged any conduct from which one could infer intentional discrimination, gross

negligence, or reckless indifference. Their sole allegations concern Defendants' questioning of

CC prior to sending him to the hospital and Gironda's conduct regarding the Allies Group and

CC's relationship with SC. As to the former, even if Defendants were wrong about CC's

suicidal tendencies and questioned him in an inappropriate manner, there is no indication that

they acted in bad faith or with gross misjudgment or because of hostility based on disability.

Plaintiffs do not argue that Defendants did not actually believe CC to be suicidal; rather, they

state only that Defendants were incorrect in their judgment. Nor have they provided any facts

from which one might infer that that allegedly incorrect judgment by six different professionals

was grossly negligent or the result of animus toward disabled people. Accordingly, Defendants'

decision to question CC and send him to the hospital does not evidence intentional

discrimination. In fact, if Defendants truly believed CC to be suicidal, it is hard to see how their

conduct does not amount to prudent behavior.

     As to Gironda's allegedly failing to consider CC's problems with social interaction in

connection with CC's relationship with SC, even assuming the ACSD could be held liable for

Gironda's behavior – an issue I need not decide – Plaintiffs' allegations fail because they are

hopelessly vague; they do not specify what Gironda actually did or did not do with respect to

CC's social issues, let alone why her actions rose to the level of bad faith or gross negligence.

Plaintiffs state in their AC that Defendants "disregarded . . . [CC's] difficulties with social

interaction," (AC ¶ 106), and in their Memorandum of Law that when CC went to Gironda for

"assistance concerning his friendship with Student S.C.," she was "deliberately indifferent to his

difficulties," (Ps' Mem. 17-18), but such conclusory assertions are insufficient to plead a plausible claim under the ADA.  Not solving CC's difficulties hardly amounts to excluding him or discriminating against him.  Plaintiffs allege no facts other than Gironda's statement, "[W]hat are you a stalker or something?"[19]  (AC ¶ 75.)  No rational jury could conclude that this lone remark, even if harsh, showed deliberate indifference or negligence, let alone gross negligence.  It is simply not plausible that a school that (apparently successfully) implemented an IEP for a student with Asperger's could be said to be indifferent to the student's condition, even if one teacher made one unkind remark on one day.  Nor is there any basis on which one could infer any sort of discriminatory intent or gross negligence from Gironda's attempt to get CC to join the Allies Group.[20]  Accordingly, Plaintiffs' ADA claim is dismissed.

b.        Retaliation – Section 504

Plaintiffs next allege that the ACSD and ACSD BOE "retaliated against, threatened and discriminated against Plaintiffs for their opinions and stances as they pertain to Plaintiff CC's education."  (*Id.* ¶ 117.)  Under Section 504, the elements of a retaliation claim are as follows: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."  *A.M.*, 2012 WL 120052, at *20; *see Stahura-Uhl v. Iroquois Cent. Sch. Dist.*, 836 F. Supp. 2d 132, 143 (W.D.N.Y. 2011).

---

[19] This remark strikes the Court as a possible attempt at humor, but I will assume that it was neither meant nor understood as such.

[20] The AC does not allege that Gironda was insincere in her belief that the Allies Group would be beneficial for CC.

Plaintiffs describe five potentially retaliatory actions:  (1) "making a false and malicious report to CPS because Plaintiffs refused speech therapy for CC"; (2) "recklessly publishing false and unprivileged statements to third parties, and thereby defaming Plaintiff CC, stating [that] he was homosexual and suicidal"; (3) sending CC to the hospital in an ambulance despite the fact that he was not suicidal; (4) refusing to provide Plaintiffs with AHS's suicide and transport policies, and (5) "recklessly publishing false and unprivileged statements to third parties that Plaintiff CC was a 'stalker.'"  (AC ¶¶ 61, 117-20; Ps' Mem. 18-19.)

With regard to the first retaliatory action – the report to CPS – Plaintiffs have expressly denied that this forms the basis for one or more of their claims.  (*See* Ps' Mem. 28 ("The facts involving the 2007 report [to CPS] were provided to support the pattern and practice of ACSD. It is not a claim . . . .").)  Accordingly, I need not address it here.[21]  As to the remaining alleged instances of retaliation, Plaintiffs' allegations fall far short of the pleading standard.  There are no plausible allegations that Plaintiffs' alleged protected activity – *i.e.*, refusal of speech therapy and the Impact Program for CC, (AC ¶¶ 32, 34, 117-18), which I will broadly construe as advocacy on behalf of CC, *see Stahura-Uhl*, 836 F. Supp. 2d at 143-44 (advocacy on behalf of disabled student is protected activity under Section 504)[22] – was causally linked in any way to the alleged retaliatory actions.  Plaintiffs have not provided any specifics about their communications with Defendants regarding their refusal of speech therapy or the Impact Program for CC.  The AC mentions only a 2007 letter stating that MC did not want anyone questioning CC without her consent, and June 2006 and August 2008 letters on unspecified

---

[21] Plaintiffs may recognize that as mandatory reporters of abuse, school personnel are immune from suit.  *See* N.Y. Soc. Serv. Law §§ 413, 419.

[22] It is far from clear that refusing speech therapy and the Impact Program for CC could constitute a protected activity, but nonetheless, I will assume that it does for the purposes of these Motions.

topics.  (*See* AC ¶¶ 33, 64.)  These letters cannot form the basis of a retaliation claim because they are too far removed from the allegedly adverse actions, all of which occurred in 2010.  *See Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (summary order) (causal connection . . . may be established by showing protected activity was "closely followed in time" by adverse action, but five months is not "close"); *Ahmad v. Int'l Bus. Machs. Corp.*, No. 10-CV-310, 2012 WL 1940666, at *7 (D. Vt. May 29, 2012) (noting that "some district courts have determined that two months is a dividing line for the purpose of showing causation," but the "Second Circuit has held that periods longer than two months may also support an inference of causation," and citing cases where causal connection found by the Circuit despite passage of six months, four to five months, and three months); *Cortes v. City of N.Y.*, No. 08-CV-4805, 2012 WL 1026136, at *11 (S.D.N.Y. Mar. 27, 2012) (one or two year lapse "too long a period to support an inference of causality"); *Jackson v. Elmhurst Hosp. Ctr.*, No. 10-CV-5248, 2012 WL 868965, at *8 (E.D.N.Y. Mar. 14, 2012) (five months to one year lapse between protected activity and alleged retaliation too remote to suggest causal connection); *McCormick v. Jackson*, No. 07-CV-7893, 2008 WL 3891260, at *2 (S.D.N.Y. Aug. 21, 2008) ("While there is no bright-line test for how much time is 'very close[]'" for temporal proximity to be sufficient, "the overwhelming majority of cases limit such time to less than six months, if not shorter").  Thus, because these letters were written years before the alleged retaliatory acts, they cannot form the basis of a retaliation claim.

The only remaining allegations concerning Plaintiffs' protected activity are their statements that Defendants "continued to recommend the 'Impact Program' and speech therapy for CC once he entered high school, with deliberate indifference to the views and opinions of MC and RC," and retaliated against Plaintiffs for their "opinions and stances" on CC's

education.  (AC ¶¶ 34, 117.)  These statements are simply too vague and conclusory to withstand

a motion to dismiss.  Plaintiffs have not alleged that they made any affirmative statements in

furtherance of their viewpoint about speech therapy and the Impact Program, and have certainly

not specified the dates or content of any such statements or actions.  From all one can tell from

the AC, the ACSD, as it had before, recommended speech therapy and the Impact Program in the

sincere belief that CC would benefit from them;[23] CC's parents declined, as they had before, in

the sincere belief that he would not; and that was that.  Thus, even if I assumed that the

Defendants recommended speech therapy and the Impact Program through the 2010 school year

and Plaintiffs continued to refuse it, without knowing *something* about these communications –

*e.g.*, the timing,[24] content, or context – there is nothing from which one may infer that they were

causally connected to the alleged retaliatory actions.  Accordingly, Plaintiffs have failed to set

forth any facts, let alone "enough facts," to "nudge[] their claim[] across the line from

conceivable to plausible."  *Twombly*, 550 U.S. at 570.

      C.    State Law Claims

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh

in favor of declining to exercise supplemental jurisdiction where all federal-law claims are

eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)

(quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having determined that

all of the claims over which this Court has original jurisdiction should be dismissed, I decline to

---

[23] Plaintiffs surely do not mean to suggest that ACSD's continued recommendations were retaliatory acts or otherwise improper.  Obviously school district professionals must recommend what they believe will best serve the student, even if they know that the parents will disagree.

[24] This discussion likely would have occurred before the start of the 2009-2010 school year, too many months before March 2010 to support an inference of causation.  It is not plausible that the IEP of a student who had had an IEP for eight years would not have been finalized many months before March.

exercise supplemental jurisdiction over Plaintiffs' remaining state-law causes of action (causes of action 6-11).[25]  *See id.* (citing 28 U.S.C. § 1367(c)(3)).  In the Court's view, however, there are significant procedural and substantive issues with the state claims to which Plaintiffs' counsel must give further thought before pursuing those claims in state court.

  D. <u>Leave to Amend</u>

  Leave to amend should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see Zucker v. Five Towns Coll.*, No. 09-CV-4884, 2010 WL 3310698, at *3 (E.D.N.Y. Aug. 18, 2010).  It is within the discretion of the district court to grant or deny leave to amend, *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and "[l]eave to amend, though liberally granted, may properly be denied for:  undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).  Where the "problem with [a complaint] is substantive[ and] better pleading will not cure it," leave to amend should be denied as futile.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see Malester v. Adamo*, No. 09-CV-9374, 2010 WL 5065865, at *4 (S.D.N.Y. Dec. 8, 2010) ("A motion for leave to amend should be denied when allowing such an amendment would be futile in that it could not withstand a motion to dismiss for failure to state a claim."); *Lee v. Regal Cruises, Ltd.*, 916 F. Supp. 300, 304 (S.D.N.Y. 1996) (leave to amend not

---

[25] As such, I need not address whether a notice of claim was filed with Dutchess County and if so, whether it was properly served on the Dutchess Defendants.  (*See* Defendants Dutchess County Sheriff's Department, Deputy Sheriff Janine Arsenault and Deputy Sheriff Michael Rahilly['s] Memorandum of Law in Support of Motion to Dismiss Pursuant to F.R.Civ.P. Rule 12(b)(6) ("DDs' Mem."), (Doc. 28), 3, 12-14.)  Nor need I address Defendants' arguments regarding *Monell* liability and absolute and qualified immunity.

proper where "proposed amendment would be futile, as the factors upon which plaintiffs now would rely would be insufficient to salvage their case even if leave to amend were granted").

During a conference before this Court on July 22, 2011, the Court and the parties discussed the deficiencies in Plaintiffs' Complaint, many of which were noted in Defendants' pre-motion conference letters.  (Docs. 18, 21.)  The Court granted Plaintiffs leave to amend their Complaint – in fact, required them to amend – in order to address the numerous deficiencies.  In response to the instant Motions, Plaintiffs neither have asked to amend again nor otherwise indicated that they are in possession of facts that could cure the deficiencies identified in this Opinion.  Thus, because Plaintiffs have already had the opportunity to amend their Complaint, and because there is no indication that amendment would not be futile, I decline to now *sua sponte* grant leave to amend again.  *See Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where plaintiff had already amended complaint once and amendment would have been futile); *Payne v. Malemathew*, No. 09-CV-1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*.").  Furthermore, a district court has no obligation to grant leave to amend *sua sponte*. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [to amend the complaint] that was not made.").

IV.     **Conclusion**

For the foregoing reasons, all of Plaintiffs' federal claims against Defendants (causes of action 1-5) are dismissed with prejudice.  Plaintiffs' remaining state-law claims (causes of action 6-11) are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 25, 29), and close the case.

**SO ORDERED.**

Dated: July _24_, 2012
          White Plains, New York

_____
          CATHY SEIBEL, U.S.D.J.

32